IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　*Plaintiff,*<br>　vs.<br><br>KENNETH RICKY INGLE, JR.,<br><br>　　　　*Defendant.* | DOCKET NO. 1:20 CR 99<br><br>**DEFENDANT'S POSITION RE: SENTENCING; EXHIBIT** |

　　　　Kenneth Ricky Ingle, Jr. ("Ricky"), by and through his counsel of record, Emily M. Jones, hereby submits his position regarding sentencing factors. Ricky's sentencing position is based on the attached sentencing memorandum, exhibit, and any further evidence and argument that may be presented by sentencing.

　　　　　　Respectfully submitted:

　　　　　　s/ Emily M. Jones
　　　　　　Emily M. Jones
　　　　　　N.C. Bar No. 35720
　　　　　　Assistant Federal Public Defender
　　　　　　Attorney for Kenneth Ricky Ingle, Jr.
　　　　　　Federal Public Defender for the Western District of North Carolina
　　　　　　1 Page Avenue, Suite 210
　　　　　　Asheville, NC  28801
　　　　　　Phone:  (828) 232-9992
　　　　　　Fax:  (828) 232-5575
　　　　　　emily_m_jones@fd.org

Date:  December 9, 2021

1

# I.
# INTRODUCTION/PROCEDURAL BACKGROUND[1]

Ricky Ingle started out behind in life. As a little boy, he suffered from cardiac issues and had to have heart surgery when he was just a toddler. He was hearing impaired; doctors placed tubes in his ears. On top of that, in school, he was diagnosed with Attention Deficit Disorder. He went untreated, because his mother did not want him to be medicated. And the list of challenges that Ricky faced just grew and grew. He was beaten by his dad, a mentally ill crack addict, who was in and out of jail. And little Ricky would cope with the physical and emotional pain from these beatings by huffing gas, butane, and paint. The constellation of challenges Ricky faced were so numerous and wide-ranging that it was hard to tell where one ended and another began. When he was placed in the Exceptional Children's Program in school, it may have been because of what huffing gas did to his young brain. Or it may have been because of the challenges he was born with. Ricky suffered from depression starting in middle school. Being bullied by his father, his father's friends, and his classmates probably didn't help.

And while Ricky started out behind in life, his circumstances seemed to push him further and further back. While he was still young, he "graduated" from huffing to smoking marijuana. He used marijuana to self-medicate his depression and anxiety. More frightening, as a teenager, Ricky began abusing pills every day. And

---

[1] The facts in this section are based on the discovery, the Court file, and defense counsel's investigation in this case, unless otherwise noted.

just a few years ago, he began shooting up morphine and methamphetamine. He was using them daily when he committed this offense.

While Ricky recognized his truly poor decision-making when he was under the influence, the young man with all these challenges was kind of stuck. His drug addiction and mental health conditions were untreated. And his addiction led directly to his criminal record, with marijuana-related convictions, and a theft he committed to support his habit. When Ricky tried to work, he found he couldn't hold a job because of his crippling anxiety and depression. He was isolated and unhappy.

### A. "I wanted help."

Then in the spring of 2020, the COVID-19 pandemic led the country to lock down. For an already-challenged solitary and depressed person like Ricky, it was a perfect storm. He would use meth every day, and stay up for days at a time. He would spend hours on the internet. His mental state deteriorated. Ricky decided to drown himself in a lake near his home. He explains, "I was going to go on a fishing trip with no return plans." He sees now that he was doing so poorly back then that he committed this offense because "[he] wanted help."

Ricky thought if his actions came to the attention of the authorities, he would get the help that he needed. And he was half right. His actions definitely came to the attention of the authorities, who took emergency measures; apparently out of concern about the things he was saying online. Luckily, in spite of what he said online, authorities did not find evidence that Ricky actually took the pictures that he discussed online at Paragraph 26 on the PSR. In fact, when interviewed by the

authorities, although Ricky admitted to committing crimes, he consistently denied taking those photos or even knowing that pornographic photos of those subjects existed. PSR ¶¶ 56-58. And apart from a contact that occurred while taking one suggestive photo, there was no evidence of other contact with those subjects. PSR ¶ 59. In fact, the father of those subjects told authorities that Ricky only was around them for about 10 minutes total. PSR ¶ 62.

After Ricky's online conduct led to his arrest 14 months ago, his life changed drastically. Sober and rested now, he can see not only the harm he was causing to himself, but also the harm his actions caused to others. He can see how his mental illness and drug use contributed to his horrible decision-making. He even has learned about the cognitive difficulties from which he has suffered since he was a child. He did not know what was wrong with him; just that he had trouble understanding things and making it in the world. As he told defense counsel, "I'm finding out more things about myself than I have my whole life." It was heartbreaking to hear that it took Ricky's arrest in this case for that to happen.

And while he recognizes that he has caused great harm for which significant punishment is warranted, the conditions in which he has been detained over the last year have been nearly inhumane. Ricky only knows detention at Buncombe Jail during the pandemic, where detainees are locked down and confined to their cells 23 hours a day. He recalls during the Christmas holidays last year when the jail was understaffed, and detainees sometimes would find themselves let out of their cells for just 15 minutes. Suffice to say, especially for a mentally ill person who struggled

with isolation before, his imprisonment thus far already has been very serious for Ricky.

### B. Procedural background

On October 6, 2020, the Government filed a Bill of Indictment, charging Ricky with receipt, production, distribution, and possession of child pornography, under 18 U.S.C. §§ 2252A(a)(2)(A), 2251(a), and 2252A(a)(5)(B). He made his initial appearance on October 30, 2020, and was appointed counsel. On April 22, 2021, Ricky pled guilty to one count of production.

### C. PSR and objections

The defense received the Draft Presentence Report on June 1, 2021, and submitted objections to it on June 30, 2021. A Final Presentence Report ("PSR") was filed on July 1, 2021. Ricky maintains his outstanding objections to the PSR; specifically, to the increase for his distribution of the images/videos that he produced.[2]

If Ricky prevails on these objections, the resulting advisory Guideline Range, based upon a total offense level of 38 and his criminal history category of III, is 292 to 365 months (so 292 to 360 months based on the statutory maximum sentence). Ricky also will ask the Court for a further downward variance of 2 levels to account for his increase for the use of a computer, which does not meaningfully distinguish his offense from that of other offenders. That resulting advisory Guideline Range is

---

[2] His outstanding objections impact the following paragraphs of the PSR: 64, 73, 78, 79, 82, and 135.

235 to 293 months (36/III). Last, he will ask the Court for a 3-level downward variance for his mental and emotional condition as well as his drug dependence. These reductions would result in a total offense level of 33, which with his criminal history category III, would result in a Guideline Range of 168 to 210 months' imprisonment (so 180 to 210 months' imprisonment with his 15-year mandatory minimum sentence). Ricky is asking this Court for a sentence of **180 months' imprisonment.**

## II.

## LEGAL ARGUMENT

### A. The distribution increase was improperly applied here.

As a preliminary matter, counsel notes that she could not locate any caselaw squarely on point regarding whether the distribution increase under USSG § 2G2.1(b)(3) was improperly applied under these circumstances. However, there is no evidence that *Ricky* distributed the images or videos he produced to anyone, whether by directly sending them or even by peer-to-peer sharing. Thus, he contends that his actions amounted to "mere solicitation" and not distribution.

Moreover, the Sentencing Commission's reasons for including the distribution increase do not apply to Ricky's conduct. The USSG § 2G2.1 Guideline changed in 2004, in amendment 664. The Commission noted:

> The amendment adds three new specific offense characteristics that are associated with the production of child pornography … [Second, t]he amendment also adds a two-level increase if the production offense also involved distribution. The Commission concluded that because traffickers sentenced at § 2G2.2 receive

6

> an increase for distributing images of child pornography, an
> individual who produces and distributes the image(s) also
> should be punished for distributing the item…[3]

These reasons for the distribution increase do not apply to Ricky, as he did not produce and distribute the images the same way a trafficker would.

Also, while the Commission's reasoning does not specify why it included the "mere solicitation" exception under the note for § 2G2.1(b)(3), it did explain that it provided a two-level decrease at § 2G2.2(b)(1) for similar conduct, because

> individuals convicted of receipt of child pornography with no
> intent to traffic or distribute the material essentially will have
> an adjusted offense level of level 20, as opposed to an offense
> level of level 22, for receipt with intent to traffic, prior to
> application of any other specific offense characteristics. The
> Commission's review of these cases indicated the conduct
> involved in such "simple receipt" cases in most instances was
> indistinguishable from "simple possession" cases. The statutory
> penalties for "simple receipt" cases, however, are the same as
> the statutory penalties for trafficking cases. Reconciling these
> competing concerns, the Commission determined that a two-
> level reduction from the base offense level of level 22 is
> warranted, if the defendant establishes that there was no
> intent to distribute the material.

In an unpublished case, the Sixth Circuit recognized this departure and concluded that "the existence of a two-level decrease in the Guidelines, pursuant to

---

[3] The Commission noted it increased the base offense level for traffickers under § 2G2.2 "because, when combined with several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images), the mandatory minimum of 60 months' imprisonment will be reached or exceeded in almost every case by the Chapter Two calculations."

7

§ 2G2.2(b)(1), suggests that a base offense level of 22 may overstate the harm of mere solicitation …" *United States v. Davis*, 659 F. App'x 864, 866 (6th Cir. 2016).

The existing caselaw also suggests that the distribution increase should not be applied in circumstances like these. In *United States v. Grzybowicz*, 747 F.3d 1296 (11th Cir. 2014), the defendant argued there was insufficient evidence to sustain his conviction for distribution <u>and</u> that the court improperly applied the distribution enhancement under § 2G2.1(b)(3). The court agreed the defendant was improperly convicted of distribution as a substantive charge, based on the facts of the case. Specifically, the court noted that the defendant sent four images of child pornography from his own cellphone to his personal email account. He then downloaded those images onto his computer. There was no evidence he uploaded them to any sort of peer-to-peer software or that he otherwise shared the images with others. The court concluded that "because it did not present any evidence that [defendant] transferred child pornography to others or 'freely allowed them access to his computerized stash of images,'… the government failed to establish 'distribution' within the meaning of § 2252A(a)(2)." The court did not reach the distribution guideline enhancement after vacating the substantive conviction. Like the defendant in *Grzyowicz*, there is no evidence that Ricky intended to or did share the materials he produced with anyone, including posting on peer-to-peer software. Overall, as it appears the Sentencing Commission's reasons for the distribution increase do not apply to the circumstances here, and because there is no caselaw applying the increase under these circumstances, it should be removed.

8

> B. A downward variance of 2 levels is warranted because Ricky's use of a computer to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct does not meaningfully distinguish his case from others under this Guideline.

The increase under USSG § 2G2.1(b)(6)(B) applies when, "for the purpose of producing sexually explicit material…the offense involved (A) the knowing misrepresentation of a participant's identity to persuade induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct; or (B) the use of a computer…to persuade, induce, entice, or facilitate the travel of, a minor to engage in sexually explicit conduct..or…solicit participation with a minor in sexually explicit conduct." The PSR applies this increase based on subsection (B). This Court has acknowledged—at least in the context of the child pornography trafficking, receipt, and possession Guideline, USSG § 2G2.2—that the increase for "use of a computer…for the possession, transmission, receipt, or distribution of the material" does not meaningfully distinguish one defendant from another, because that increase applies to virtually everyone sentenced under that Guideline. In other words, the involvement of a computer in many of those types of child pornography offenses is implicit in the offense, because the only way people access child pornography these days is on the computer.

On the other hand, this case is somewhat different because while many people who produce child pornography use a computer, that is not true in every case. But while not everyone who produces child pornography uses a computer, that does not necessarily mean that the use of a computer is an aggravating factor that

9

warrants a higher sentence. In fact, it could be argued that the use of a computer in Ricky's case was <u>less</u> aggravating than, say, an in-person child pornography production involving a camera. As opposed to someone involved in an in-person child pornography production, here, Ricky was never even in the same room with the victim. He never had even had contact with the victim, like posing the victim while taking a picture or more serious contact. Overall, where there may be times that the increase under this section is warranted, like for "knowing misrepresentation of a [person's] identity" when someone goes online and pretends to be a peer to a teen or preteen victim, the increase is not warranted here.

### C. A downward variance of 3 levels total is warranted based on Ricky's mental and emotional condition, as well as his drug dependence.

#### 1. Mental and emotional condition

A downward variance is warranted based on Ricky's mental and emotional condition. The Psychological Report from Dr. Ashley King helps to explain the conditions from which he suffers. Exhibit A at 1-7. Dr. King found Ricky suffered from "cognitive deficits". *Id.* at 4. And the PSR cited a school psychological report which determined his full scale IQ to be 81 (or "low average") and that he qualified for the Exceptional Children's Program. PSR ¶ 118. Dr. King also found the following when she met with Ricky, "[h]e was easily flustered and at times visibly sweating, crying, and distracted by his emotions." Ex. A at 3. Defense counsel, too, has observed similar issues, as Ricky starts crying almost every single time she meets with him.

Dr. King also reported Ricky's "chronic problems with cutting [himself] and suicidal ideation." *Id.* at 4. She concluded that he appears to suffer from "chronic depression", "Post Traumatic Stress Disorder, and "Other Specified Personality Disorder with Avoidant and Borderline Features." *Id.* Even when a door slams at the jail—which happens often—Ricky tells counsel, his "hair stands on end." Ricky's loved ones corroborate his mental and emotional condition. His mother cites his "bouts of depression". Ex. A at 8.[4] Similarly, Ricky's grandmother notes that he was depressed, and that "he has been trying so hard to fight his depression" at the jail. *Id.* at 13.

Unfortunately, except from some extra educational support, Ricky largely has fallen through the cracks when it came to his mental and emotional issues. His mother didn't want him to be put on medication for his ADD as a child, so he muddled his way through it on his own. And while mental health treatment was recommended for him finally in 2019—just before this offense—Ricky acknowledges that he was fearful about getting treatment after his father had been institutionalized when <u>he</u> sought treatment.

But on the positive side, Ricky has realized that he heeds help for his mental health issues and has sought help since then. When he was first arrested and housed at the Cleveland County Jail, he requested mental health treatment, though unfortunately, no one was available to provide treatment while he was there. Then

---

[4] Handwritten letters preceded by typed versions for the Court's convenience.

he was moved to the Piedmont Correctional facility, where he again requested mental health treatment. The provider there told Ricky that she hated to say "no"—because she recommended he receive treatment—but he would not be at the facility long enough to get it. Again, once he was moved to Buncombe County Jail, Ricky made a request for mental health treatment. There, he was told that he probably was just going through situational depression because he was in jail, though he explained he had been struggling with depression since middle school. It was suggested that Ricky do some breathing exercises. Nevertheless, Ricky is doing what he can to address his mental health issues on his own, as his friend writes to the Court, "I know he's working on his mental health…He's making progress in my opinion, but just looking for the right help." Ex. A at 16.

And not only has Ricky sought mental health treatment over the last year, but Dr. King explains that mental health treatment could help to reduce his risk of recidivism in the future. *Id.* at 6. She recommends that he "be referred for a medication evaluation" to assist with his PTSD and Other Specified Personality Disorder. *Id.* She also recommends that Ricky receive psychotherapy—which he never has received before—"to treat and manage his PTSD and increase his coping skills." *Id.* Moreover, Dr. King recommends that his mental health treatment continue when he is on supervised release.

### 2. Drug dependence

A downward variance also is warranted based on Ricky's drug dependence. Ricky has suffered from drug addiction since he was a child. The progression from

huffing all the way to using IV drugs, is more frightening when the volume of the drugs he ingested is considered. He reported using inhalants every other day for two years; in other words, Ricky used inhalants over 365 times, beginning when he was a young person around 10 years old. And whatever damage he had done to his brain was only compounded by very heavy daily morphine and methamphetamine use later on. While Ricky's drug dependence was not the reason for his offense, he recognizes staying up for days on methamphetamine contributed to his terrible decision-making here.

Dr. King also explains that substance abuse treatment could help to reduce Ricky's risk of recidivism in the future. *Id.* at 6. She recommends that he "undergo intensive substance abuse treatment, including relapse prevention planning." *Id.* Moreover, she recommends that he "participate in an ongoing substance abuse treatment group" when he is on supervised release. *Id.*

Overall, this Court can impose the requested **180-month sentence** on Ricky based on the above considerations or any other factor it finds. As the Supreme Court explained in *Rita v. United* States, 551 U.S. 338, 348 (2007), the law directs that the Sentencing Commission should (and does) allow judges to "'maintai[n] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices,' and to 'reflect, to the extent practicable, [sentencing-relevant] advancement in [the] knowledge of human behavior.'" And many

13

mitigating factors are present here, warranting this lower sentence in Ricky's individual case.

These factors include Ricky's childhood abuse and neglect, which contributed to his mental health problems. While Ricky's mother minimized this, saying his father "tapped" Ricky with objects, leaving bruises, (Ex. A at 2), it is clear that it would take more than just a "tap" to bruise a child. That Child Protective Services were called after Ricky was beaten so badly by his father that he could not sit down at school just is more evidence of the seriousness of the abuse he experienced. Apparently the abuse was so routine that Ricky's father even allowed his friends to beat Ricky. *Id.* Ricky reported one time when he told his father that he wished he were dead; his dad proceeded to point a gun at him. *Id.* In fact, when defense counsel was able to reach Ricky's father to discuss his case, his father said, "I'm gonna kick his a--" upon his release. His father's reaction now is just as inappropriate as it was when Ricky was a child.

The mitigating factors here also include that Ricky was bullied. As Dr. King recounted, he "said he was a 'big kid' and was bullied, laughed at, and left behind by the other children his brother played with in the trailer park." *Id.* at 2. The same thing happened in school. *Id.* And to add insult to injury, his father even allowed his friends to make fun of Ricky. Ricky was the subject of bullying for years of his life. Another mitigating factor here is that Ricky generally experienced an unusually high level of childhood trauma, also called Adverse Childhood Events (ACEs). As Dr. King concludes, as Ricky had eight of the ten ACE trauma experiences, he had

an "unusually high" level of childhood trauma. *Id.* at 5. As Dr. King explained, those ACE factors do not even include some of the childhood traumas Ricky experienced, like poverty and bullying. *Id.*

In conclusion, Ricky asks this Court for leniency, as he is a person with many challenges, and he feels incredible remorse. Once he has the mental health and substance abuse treatment he plans to receive for the first time in the federal prison, he thinks he will have much better tools to abide by the law in the future. Even though Ricky has been somewhat isolated in the past, the Court also can see that he has family support from his mother and maternal grandmother. His paternal grandmother is supportive of him as well. But now Ricky fears that his actions in this case mean that the small support network he has will not survive his sentence. This is very possible as his grandmothers are 76 and 77 years old.

Ricky now has the insight that may have helped him before he committed the offense, saying, "I want help with everything", the pornography, drugs, and mental health issues with which he has struggled. He is eager to get the help be needs moving forward, and to pay his debt to society.

### III.

### OTHER SENTENCING CONSIDERATIONS

Because "a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction…the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment." USSG § 5G2.3(c). Thus, Ricky asks the Court to order that this

15

sentence run concurrently with the anticipated sentence in case 20 CRS 53411 from Cleveland County, North Carolina. PSR ¶ 96. He also asks for a recommendation that he be allowed to participate in mental health and substance abuse treatment at the federal prison.

## IV.

## CONCLUSION

For the foregoing reasons, Kenneth Ricky Ingle, Jr. respectfully requests that the Court sentence him to 180 months' imprisonment, to be run concurrently with the anticipated sentence in case 20 CRS 53411 out of Cleveland County, North Carolina.

Respectfully submitted:

s/ Emily M. Jones
Emily M. Jones
N.C. Bar No. 35720
Assistant Federal Public Defender
Attorney for Kenneth Ricky Ingle, Jr.
Federal Public Defender for the Western District of North Carolina
1 Page Avenue, Suite 210
Asheville, NC 28801
Phone: (828) 232-9992
Fax: (828) 232-5575
emily_m_jones@fd.org

Date: December 9, 2021